(TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED:- TORT - MOTOR VEHICLE TORT - CONTRACT - EQUITABLE RELIEF - OTHER.)

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION

NO. 07 00599

James Barthel, Plaintiff(s)

v.

CPI Corporation, et al, Defendant(s)

**SUMMONS**

To the above-named Defendant:

You are hereby summoned and required to serve upon James A Kohe, plaintiff's attorney, whose address is 20 William Street, Suite 155 Wellesley, MA 02481, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Dedham either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WITNESS, BARBARA J. ROUSE, Esquire ~~SUZANNE V. DELVECCHIO, Esquire~~, at .......... the 4th

day of May, in the year of our Lord two thousand and 2007

Walter F. Timilty Clerk.

NOTES:

1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

F-33

| **CIVIL ACTION COVER SHEET** | DOCKET NO.(S) | **Trial Court of Massachusetts Superior Court Department** **County:**____________ |
|---|---|---|

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| James Barthel | CDI Corporation Roger Ballou, Mark Kerschner |
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE James Kobe 20 William Street #155 Wellesley, MA 02481 781-283-9191 Board of Bar Overseers number: 548218 | ATTORNEY (if known) |

**Origin code and track designation**

Place an x in one box only:

- ☒ 1. F01 Original Complaint
- ☐ 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- ☐ 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)
- ☐ 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- ☐ 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- ☐ 6. E10 Summary Process Appeal (X)

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| A99 | Commission + Retaliation | (F) | (✓) Yes ( ) No |

**The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.**

**TORT CLAIMS**
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ........ $........
2. Total Doctor expenses ........ $........
3. Total chiropractic expenses ........ $........
4. Total physical therapy expenses ........ $........
5. Total other expenses (describe) ........ $........

**Subtotal $........**

B. Documented lost wages and compensation to date ........ $........
C. Documented property damages to date ........ $........
D. Reasonably anticipated future medical and hospital expenses ........ $........
E. Reasonably anticipated lost wages ........ $........
F. Other documented items of damages (describe)
$........
G. Brief description of plaintiff's injury, including nature and extent of injury (describe)
$........
**TOTAL $........**

**CONTRACT CLAIMS** (statutory claims)
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

Claim for unpaid commissions under the Wage Act (and common law claims) and for retaliation in violation of the Wage Act. Lost commissions are estimated to exceed $180,000 plus lost wages

**TOTAL $.** $180,000+

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

**"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."**

Signature of Attorney of Record [signature] DATE: 4/6/07

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000

**Commonwealth of Massachusetts**
**County of Norfolk**
**The Superior Court**

CIVIL DOCKET # **NOCV2007-00599-B**
**Courtroom CtRm 3**

RE: **Barthel v CDI Corporation et al**
TO:

James A Kobe, Esquire
James A. Kobe PC
20 William St Suite 155
Wellesley Hills, MA 02481

## SCHEDULING ORDER FOR F TRACK

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated, and case shall be resolved and judgment shall issue **01/28/2009**.

| STAGES OF LITIGATION | DEADLINES | | |
|---|---|---|---|
| | **SERVED BY** | **FILED BY** | **HEARD BY** |
| Service of process made and return filed with the Court | 07/08/2007 | 07/08/2007 | |
| Response to the complaint filed (also see MRCP 12) | | 08/07/2007 | |
| All motions under MRCP 12, 19, and 20 | 08/07/2007 | 09/06/2007 | 10/06/2007 |
| All motions under MRCP 15 | 08/07/2007 | 09/06/2007 | 10/06/2007 |
| All discovery requests and depositions served and non-expert depositions completed | 02/03/2008 | | |
| All motions under MRCP 56 | 03/04/2008 | 04/03/2008 | |
| Final pre-trial conference held and/or firm trial date set | | | 08/01/2008 |
| Case shall be resolved and judgment shall issue by **01/28/2009** | | | **01/28/2009** |

**The final pre-trial deadline is** **not the scheduled date of the conference**. You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

Dated: 04/09/2007

Walter F. Timilty
Clerk of the Court

Telephone: (781) 326-1600

**Disabled individuals who need handicap accommodations should contact the Administrative Office of the Superior Court at (617) 788-8130** --Check website as to status of case: http://**ma-trialcourts.org/tcic**

740953 notseni fosterv

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION NO.
07 00599

JAMES BARTHEL,

Plaintiff

v.

CDI CORPORATION,
MR. ROGER BALLOU and
Mr. MARK KERSCHNER

Defendants

AMENDED COMPLAINT
AND JURY DEMAND

INTRODUCTION

This is an action by plaintiff James Barthel against his ex-employer CDI Corporation ("CDI" or "the Company"), and against the CEO and CFO of CDI, respectively Mr. Roger Ballou and Mr. Mark Kerschner. Mr. Barthel asserts claims against all defendants under G.L. c. 149 § 150 for breach of the Massachusetts Wage Act (G.L. c. 149 § 148) with respect to CDI's refusal to pay him earned compensation in the form of commissions. Mr. Barthel also asserts claims against CDI for retaliating against him for asserting his rights under the Wage Act by failing to give him credit for business generated and for then terminating his employment for failing to generate sufficient business. Mr. Barthel also asserts claims against CDI for breach of contract, breach of

the implied covenant of good faith and fair dealing, for misrepresentation and for unjust enrichment.

## PARTIES

1. Plaintiff James Barthel is an individual residing at 357 Bolivar Street, Unit M, Canton, Norfolk County, Massachusetts.

2. On information and belief, Defendant CDI is a Pennsylvania corporation with a principal place of business at 1717 Arch Street, 35th Floor, Philadelphia, Pennsylvania 19103. While Mr. Barthel was employed by CDI he worked out of CDI's Westborough, Massachusetts office. On information and belief, CDI does business in Massachusetts, including in Norfolk County, Massachusetts.

3. On information and belief, defendant Roger Ballou at all relevant times was the Chief Executive Officer of CDI. Mr. Ballou is named as an individual defendant in his capacity as a managing officer of CDI with respect to plaintiff's claims for breach of G.L. c. 149 sec. 148.

4. On information and belief, defendant Mark Kerschner at all relevant times was the Chief Financial Officer of CDI. Mr. Kershner is named as an individual defendant in his capacity as the chief financial officer of CDI with respect to plaintiff's claims for breach of G.L. c. 149 sec. 148.

## JURISDICTION

5. This Court has jurisdiction over plaintiff's claims as to the defendants pursuant to the Massachusetts Long-Arm statute, M.G.L. c. 223A, sec. 3, on the grounds that CDI

employed plaintiff James Barthel in Massachusetts and failed to pay him wages that he is entitled to receive under Massachusetts law.

6. Mr. Barthel previously received a right to sue letter from the Massachusetts Attorney General's office. A copy of said letter, dated February 5, 2007, is attached hereto as Exhibit A.

## FACTS

7. Mr. Barthel was employed by CDI as a salesman in Massachusetts.
8. CDI is in the business of providing and managing staffing and outsourcing solutions in the fields of engineering and information technology.
9. Mr. Barthel was employed by CDI in its IT (Information Technology) Services division and his immediate supervisor was Chuck Bickley.
10. CDI directed Mr. Bickley to identify and close two to three Managed Service Programs with large companies in the New England region.
11. Mr. Bickley in turn hired Mr. Barthel in part to satisfy the Company's Managed Service Programs goal. Mr. Barthel had significant solution sales experience that was necessary to navigate through a multi-faceted sales cycle.
12. After Mr. Barthel was hired by CDI he was directed to create a prospect target list of the largest prospects to pursue. Mr. Barthel created that list which included both Invensys and EMC.
13. While employed by CDI, Mr. Barthel initiated contact with Invensys in an effort to secure business for CDI.

14. Invensys was the type of company that Mr. Bickley had instructed Mr. Barthel to target.

15. After Mr. Barthel first established contact with Invensys, he sought clarification from CDI as to how he would be compensated with respect to any contract he obtained for CDI with Invensys.

16. Mr. Barthel sought clarification of his compensation both from his direct supervisor, Chuck Bickley, and from Dean Maggliozzi.

17. At the time Mr. Barthel and Mr. Bickley discussed Mr. Barthel's compensation with respect to the Invensys contract, Mr. Bickley was CDI's Northeast Area Manager for IT Services.

18. At the time Mr. Barthel and Mr. Maggliozzi discussed Mr. Barthel's compensation with respect to the Invensys contract, Mr. Maggliozzi was a Vice-President in CDI's Process & Industrial Division.

19. Chuck Bickley on multiple occasions assured Mr. Barthel that with respect to any CDI contract with Invensys, that Mr. Barthel would be compensated at the rate of 2% of CDI's direct margin for the life of the contract.

20. Mr. Bickley on multiple occasions assured Mr. Barthel that with respect to any CDI contract with Invensys, that Mr. Barthel's would be compensated through CDI's Process and Industrial Division (not through the IT division) and that he would be transferred to the Process and Industrial Division.

21. Mr. Bickley also assured Mr. Barthel that Mr. Bickley had discussed with and received approval from both his own superior, Randy McClain, and from Dean Magliozzi the agreement to pay Mr. Barthel 2% of direct margin on any Invensys contract.

22. Dean Maggliozzi on multiple occasions assured Mr. Barthel, in the presence of Mr. Bickley, that with respect to any CDI contract with Invensys, that Mr. Barthel would be compensated as a National Sales Manager or National Sales Executive for the life of the contract.

23. Mr. Magliozzi on multiple occasions assured Mr. Barthel that with respect to any CDI contract with Invensys, that Mr. Barthel's would be compensated through CDI's Process and Industrial Division (not through the IT division) and that he would be transferred to the Process and Industrial Division.

24. Mr. Maggliozzi also assured Mr. Barthel that Mr. Maggliozzi had discussed with his superiors that Mr. Barthel would be treated as a National Sales Manager or National Sales Executive for the life of any Invensys contract.

25. Mr. Bickley also assured Mr. Barthel that he would be treated and classified as a "National Sales Executive" with respect to Invensys.

26. Mr. Maggliozzi also stated to Mr. Barthel that he had received approval for the Invensys bid from CDI's corporate approval team and that he had communicated to that team that Mr. Barthel would be classified as a "National Sales Executive" with respect to Invensys.

27. CDI prepared and distributed organizational charts in the form of Exhibit B hereto that listed Mr. Barthel as National Sales Executive in connection with Invensys.

28. Mr. Bickley assured Mr. Barthel that he would have ongoing account responsibility with respect to Invensys, similar to Heather Dunkin's ongoing account responsibility with respect to the Siemens account, for which she was termed the National Sales Executive.

29. Mr. Maggliozzi assured Mr. Barthel that he would have ongoing account responsibility with respect to Invensys, similar to Heather Dunkin's ongoing account responsibility with respect to the Siemens account, for which she was termed the National Sales Executive.

30. Mr. Barthel relied upon the above referenced assurances of Mr. Bickley and Mr. Maggliozzi and worked diligently to secure CDI contracts with Invensys.

31. Mr. Barthel's work included obtaining Invensys' initial approval that CDI could submit a bid on the contract in issue. (The contract in issue is a contract through which CDI provides to Invensys a managed staffing program including both quality consultants to work on Invensys projects as well as personnel to manage those consultants).

32. Mr. Barthel's work also included being heavily involved in CDI's preparation and submission of a bid, which process also included extensive client contact between Mr. Barthel and Invensys.

33. Invensys did not select CDI as the successful bidder at the conclusion of the initial bid process. Invensys' bid was approximately $600,000 higher than a competing bid.

34. Mr. Barthel worked diligently with Invensys and ultimately obtained Invensys' permission for CDI to re-work and re-present its bid.

35. Mr. Barthel participated heavily in CDI's reworking and representing of its bid.

36. Invensys ultimately accepted CDI's re-worked and re-presented bid.

37. CDI and Invensys thereafter entered into a written contract with respect to CDI's provision of hundreds of consultants (and the staff to manage them) to work on Invensys projects throughout North America.

38. Plaintiff James Barthel was the sole initiating cause of the contract between CDI and Invensys.

39. The primary Invensys liason with bidders on the contract in issues was Rick O'Dell.

40. Mr. O'Dell made the statement, (in a meeting at Invensys in the presence of Mr. Bickley and Mr. Magliozzi) that Mr. Barthel had done a masterful job in bringing all the parties together at the right time.

41. On information and belief, certain CDI internal estimates stated that the CDI Invensys contract is expected to generate annual gross revenues of approximately $20 million.

42. On information and belief, certain CDI internal estimates included a direct margin estimate of approximately 20%.

43. A 2% commission on direct margin of $4 million would generate an annual sales commission of approximately $80,000.

44. On information and belief the current level of staffing of the CDI/Invensys contract would generate annual gross revenues of approximately $16 million.

45. On information and belief the current level of staffing of the CDI/Invensys contract is expected to increase in the future.

46. On information and belief, one or more CDI analysis of the Invensys contract included as a budgeted item the payment of sales commissions.

47. Only after CDI secured the Invensys contract did CDI inform Mr. Barthel that he would not be compensated as previously promised by Mr. Bickley and Mr. Magliozzi.

48. After CDI secured the Invensys contract, CDI informed Mr. Barthel that he would only be paid a one-time "referral" bonus.

49. On information and belief, CDI has not paid commission on the Invensys contract to any other salesperson.

50. The same pattern of CDI promising Mr. Barthel a commission of 2% of direct margin and then reneging on that promise also occurred with respect to Mr. Barthel's efforts to secure a contract between CDI and EMC.

51. Mr. Bickley at one point advised Mr. Barthel that Mr. Bickley's superiors had forbidden either Mr. Bickley or Mr. Barthel from having further contact with either Invensys or EMC.

52. On information and belief, CDI ultimately did not succeed in entering into a contract with EMC.

53. Mr. Barthel raised his concerns, about the refusal of CDI to allow him work the Invensys contract and to pay him promised commissions, with Randy McClain, CDI's Eastern regional Vice President of IT Services.

54. Mr. Barthel also raised his concerns about the refusal of CDI to pay him promised commissions with Richard Giannone, then Executive Vice-President of CDI's Process and Industrial Division.

55. In response to Mr. Bickley complaining that CDI should not exclude Mr. Barthel from participating in an important meeting with Invensys, Mr. Giannone conducted a conference call regarding Mr. Barthel's interaction with Invensys.

56. In that conference call (in which Mr. Barthel, Mr. Bickley, Mr. Magliozzi and Mr. McClain also participated) Mr. Giannone refused to discuss the facts on which Mr. Barthel based his commission claim.

57. In response to Mr. Giannone request for information, Mr. Barthel prepared and forwarded to him a timeline of events relating to his work with Invensys.

58. Subsequent to the above referenced conference call, Mr. Giannone angrily denounced Mr. Barthel for making a commission claim.

59. In denouncing Mr. Barthel's commission claim, Mr. Giannone failed to address the commitments that CDI had previously made to Mr. Barthel.

60. On information and belief, Mr. Bickley passed Mr. Barthel's concerns and objections regarding CDI's treatment of him on to Mr. Bickley's superiors, including to Robert Giorgio, the President of CDI's Business Solutions operating unit.

61. On information and belief, in late May of 2006, Mr. Bickley and Mr. McClain were summoned to CDI's Philadelphia offices to discuss issues related to Mr. Barthel and Invensys.

62. On information and belief, thereafter, CDI's Human Resources Director, Mike Winning, directed Mr. Bickley that Mr. Bickley and Mr. Barthel had to drop the issue of Mr. Barthel's commission claims.

63. On August 23, 2006, Randy McClain presented Mr. Barthel an award for the Invensys "win", which he described as one of CDI's largest deals in the last several years.

64. After receiving the award for the Invensys win, Mr. Barthel again raised with Mr. McClain the unfairness of CDI's Process and Industrial Division taking both the Invensys and EMC accounts from him and depriving him of both continued involvement with and commissions on those accounts. Mr. McClain replied that he was sorry it happened but that he would have lost his job if he had further pursued Mr. Barthel's claims.

65. Shortly after August 23, 2006, CDI terminated Mr. McClain's employment.

66. On information and belief, Mr. Bickley has received criticism from his superiors for raising Mr. Barthel's commission claims.

67. Because CDI continued to refuse to pay him promised commissions, Mr. Barthel retained counsel who on December 12, 2006 made a formal written demand that Mr. Barthel be paid earned commissions. Said correspondence specifically referenced Mr. Barthel's right to be paid commissions under the Massachusetts Wage Act, G.L. c. 149 §148. (Mr. Barthel's demand letter is attached hereto as Exhibit C).

68. In early January of 2007 CDI formally rejected Mr. Barthel's claim for commissions.

69. On January 15, 2007 CDI issued a Corrective Action Form to Mr. Barthel that described a performance improvement plan. The January 15, 2007 Corrective Action Form is attached hereto as Exhibit D.

70. The January 15, 2007 Form stated that Mr. Barthel would be terminated in thirty days if he failed to meet or exceed the referenced plan.

71. The January 15, 2007 Form's referenced plan required that within thirty days Mr. Barthel close two new accounts (agreements completely executed) and among other goals, also bring in four new job orders from new accounts per week.

72. At the time CDI presented Mr. Barthel with the January 15, 2007 Form, CDI was aware that the goal of Mr. Barthel closing two new accounts could not be achieved within thirty days.

73. The January 15, 2007 Form acknowledged Mr. Barthel's work with Invensys and EMC in stating "No new account penetration in 2006 beyond Invensys and EMC."

74. The January 15, 2007 Form did not give Mr. Barthel any credit for Invensys related orders, placements or Direct Margin.

75. On January 23, 2007 Mr. Barthel filed a Complaint with the Attorney General's Office alleging breach of the Massachusetts Wage Act for failure to pay commissions and alleging retaliation against Mr. Barthel for making claims for violation of the Wage Act.

76. The Massachusetts Attorney General's Office issued a right to sue letter to Mr. Barthel dated February 5, 2007. (A copy of the right to sue letter is attached hereto as Exhibit A).

77. On February 20, 2007, CDI issued a more detailed Corrective Action Form to Mr. Barthel. (A copy of the February 20, 2007 Corrective Action Form is attached hereto as Exhibit E).

78. The Corrective Action Form states that it is a written final warning. It also concludes by stating that "If Jim does not meet all of these goals each week of this final warning, his employment will be terminated at that point."

79. On February 27, 2007, Bill Lage of CDI informed Mr. Barthel that he was being terminated.

COUNT I

Claim against CDI, Mr. Ballou and Mr. Kershner pursuant to
M.G.L. c. 149 sec. 150 for breach of c. 149 sec. 148
(Failure to pay Wages including Commissions)

80. Plaintiff restates and incorporates herein by reference his allegations contained in paragraphs one through 79.

81. CDI, Mr. Ballou and Mr. Kershner failed to pay plaintiff Barthel agreed upon commissions with respect to CDI's direct margin on its contract with Invensys.

82. On information and belief, Mr. Barthel's unpaid commissions with respect to CDI's direct margin on its contract with Invensys exceed $60,000 on an annual basis.

83. The failure of CDI, Mr. Ballou and Mr. Kershner to pay Mr. Barthel his earned commissions constitutes a breach of the Massachusetts Wage Act, M.G.L. c. 149 sec. 148.

84. Pursuant to M.G.L. c. 149 sec. 150, Mr. Giorgio and Mr. Kershner are each individually liable for CDI's breach of the Wage Act.

COUNT II

Claim Against CDI pursuant to M.G.L. c. 149 sec. 150
for breach of M.G.L. c. 149 sec. 148A
(Discharge of and Discrimination Against
Mr. Barthel For Seeking Rights Under Chapter 149)

85. Plaintiff restates and incorporates herein by reference his allegations contained in paragraphs one through 84.

86. Plaintiff demanded of CDI that he be paid commissions with respect to CDI's contract with Invensys.

87. Plaintiff made direct demand himself to his superiors.

88. Plaintiff made demand through counsel by letter dated December 12th, 2006 (Exhibit C).

89. In response to plaintiff's demands, CDI issued a Corrective Action Form dated January 15, 2007 (Exhibit D). CDI's January 15, 2007 Corrective Action Form stated that Mr. Barthel was subject to termination on February 15, 2007.

90. The January 15, 2007 Corrective Action Form noted Mr. Barthel's work with Invensys (and EMC) but gave him no credit for the significant number of placements and direct margin generated by the Invensys contract.

91. On January 23, 2007 Mr. Barthel filed a Wage Act Complaint with the Massachusetts Attorney General's Office.

92. On February 5, 2007 the Massachusetts Attorney General's Office issued Mr. Barthel a right to sue letter.

93. On February 20, 2007, CDI issued Mr. Barthel a Final Written Warning that threatened him with termination if any weekly goal was not met.

94. On February 27, 2007, CDI informed Mr. Barthel that he was being terminated.

95. On information and belief, CDI's January 15, 2007 Correct Action Form and Performance Plan and its subsequent termination of Mr. Barthel were in retaliation for his prior complaints seeking payment of commissions pursuant to his agreements with Company representatives and pursuant to the Massachusetts Wage Act.

COUNT III

Breach of Contract Against CDI

96. Plaintiff restates and incorporates herein by reference his allegations contained in paragraphs one through 95.

97. CDI's failure and refusal to pay Mr. Barthel commissions as promised by CDI constitutes a breach of CDI's contract with Mr. Barthel.

COUNT IV

Breach of Duty of Good Faith and Fair Dealing

98. Plaintiff restates and incorporates herein by reference his allegations contained in paragraphs one through 97.

99. CDI's failure and refusal to pay Mr. Barthel promised commissions with respect to the Invensys contract that he originated and secured constitutes a breach of CDI's obligation of good faith and fair dealing.

COUNT V

Misrepresentation

100. Plaintiff restates and incorporates herein by reference his allegations contained in paragraphs one through 99.

101. CDI, through its officers and agents, misrepresented to Mr. Barthel the commission compensation he would receive if CDI secured a contract with Invensys.

102. CDI, through its officers and agents, misrepresented to Mr. Barthel the credit he would receive (with respect to business generated) if CDI secured a contract with Invensys.

103. Mr. Barthel relied on these misrepresentations to his detriment, including being terminated by CDI after seeking the promised compensation and including which CDI seeks to justify by Mr. Barthel's claimed failure to develop sufficient business for CDI.

COUNT VI

Unjust Enrichment

104. Plaintiff restates and incorporates herein by reference his allegations contained in paragraphs one through 103.

105. As a result of CDI's failure to pay Mr. Barthel promised commissions and its related termination of Mr. Barthel, CDI has been and will continue to be in the future unjustly enriched by the amount of commissions that it promised to pay yet has failed and refused to pay to Mr. Barthel.

WHEREFORE, plaintiff James Barthel seeks to recover damages that he has suffered with respect to defendants' breaches as alleged in Counts I through VI including but not limited to the following:

a. Commissions that otherwise would have been paid to him with respect to business with Invensys if CDI had honored its promises and agreements and had not improperly terminated him; and

b. Damages that he has sustained as a result of CDI's improper termination of his employment.

c. As to Mr. Barthel's claims under the Massachusetts Wage Act for violations of M.G.L. c. 149 sec. 148, 148A and 150, plaintiff is entitled to recover treble damages and attorney's fees.

JURY DEMAND

Plaintiff demands a trial by jury on all counts.

Respectfully submitted on behalf of
Plaintiff James Barthel
By his Attorney

James A. Kobe, Esq.
B.B.O. #548218
James A. Kobe, P.C.
20 William Street, Suite 155
Wellesley, MA 02481
(781) 283-9191

Dated: April 17, 2007

# Exhibit A



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL

WESTERN MASSACHUSETTS DIVISION
1350 MAIN STREET
SPRINGFIELD, MASSACHUSETTS 01103-1629

MARTHA COAKLEY
ATTORNEY GENERAL

(413) 784-1240
www.ago.state.ma.us

February 5, 2007

James Barthel
c/o Attorney James A. Kobe
20 William Street, Suite 155
Wellesley, MA 02481

**Re: Authorization for Immediate Private Suit-CDI Corporation**

Dear Mr. Barthel:

Thank you for contacting the Office of the Attorney General's Fair Labor and Business Practices Division.

This letter is to inform you that we have carefully reviewed your complaint and have determined that the proper resolution of this matter may be through a private suit in civil court. Accordingly, we are authorizing you to pursue this matter through a civil lawsuit immediately.

Massachusetts General Laws chapter 149, § 150, and chapter 151, §§ 1B and 20 establish a private right of action for employees who believe they are victims of certain violations of the state wage laws. If you elect to sue in civil court, you may bring an action on your own behalf and others similarly situated, and you may obtain injunctive relief, treble damages for any loss of wages and other benefits, as well as the costs of litigation and reasonable attorneys' fees.

Without making a judgment on the merits of your complaint, this correspondence represents this office's written assent to sue and grants you the authority to pursue this matter against your employers immediately, as permitted by Massachusetts General Laws chapters 149 and 151. This office will not take further enforcement action at this time.

Thank you for your attention to this matter.

Sincerely,

Bruce E. Bussiere, Supervising Inspector
Fair Labor and Business Practices Division
(413) 784-1240, Ext 128

# Exhibit B


CDI Business Solutions
Transition Leadership and Team
Process for Program Roll-out…
VP/General Manager
(Dean Magliozzi)
National Sales Executive
(Jim Barthel)
Transition Project Director
(Mike Heiring)
Project Controls
(Tim Ratner)
Sr. Operations Director
(Mark Perry)
RPM Fulfillment Manager
(Heather Bailey)
SAN Director
(Davida Black )
HR Manager
(Robin Galli)
Technology Director
(Roger Strain)
Business Systems
(Joanie Kostas)

# Exhibit C

**James A. Kobe, P.C.**
**Attorney At Law**
**Wellesley Office Park**
**20 William Street, Suite 155**
**Wellesley, Massachusetts 02481**

**Telephone (781) 283-9191**
**Fax (781) 283-9190**

December 12, 2006

Via Fax and First Class Mail
Joseph R. Seiders, Esq.
Senior Vice President, General Counsel
CDI Corporation
1717 Arch Street, 35th Floor
Philadelphia, PA 19103

Re: James Barthel Commission Issues

Dear Attorney Seiders:

This office represents James Barthel who works in CDI's Massachusetts office located in Westborough, Massachusetts. Mr. Barthel works under the supervision of Chuck Bickley, who is the Northeast Area Manager for IT Services. The purpose of this letter is to bring to your attention Mr. Barthel's claims arising out of CDI's repudiation of its commission obligations to him. CDI's actions are in violation of the Massachusetts Wage Act, Mass. Gen. Laws c. 149 §148. Under the provisions of the Wage Act a successful plaintiff is entitled to recover attorney's fees and damages up to three times his actual damages. Mr. Barthel is prepared to pursue his Wage Claim with first the Attorney General's Office and then, if necessary, in Court. The purpose of this letter, however, is to explore whether CDI first wishes to discuss a negotiated resolution of Mr. Barthel's claims. This letter also constitutes a formal demand for copies of all of Mr. Barthel's personnel records, as that term is defined in M.G.L. c. 149, § 52C, that are in CDI's possession, custody or control.

Mr. Barthel's claims arise out of CDI's repudiation of its prior promises to pay him commissions on CDI's major contract with Invensys, a contract that was solely initiated by Mr. Barthel and that would not have been entered into without his continuing efforts. CDI's contract with Invensys is for two years with an option for a third and covers all Invensys North American divisions. (Mr. Barthel also had discussions with Invensys about additional contracts that have not yet materialized). CDI's initial contract

bid was for in excess of $16 million in gross revenues per year and with an expected direct margin of approximately 20%. CDI subsequently raised its annual revenue estimates to approximately $20 million per year.

After Mr. Barthel first established contact with Invensys, he sought clarification as to how he would be compensated by CDI with respect to any contract with Invensys. He was repeatedly assured by both his direct supervisor, Chuck Bickley, and by Dean Maggliozzi, a Vice President in CDI's Process and Industrial division, that he would be compensated at the rate of 2% of CDI's direct margin for the life of the contract. Mr. Bickley and Mr. Maggliozzi also assured Mr. Barthel that they had discussed these arrangements with their superiors. Mr. Barthel was also assured on multiple occasions that though he was currently in CDI's IT division, he would be compensated through CDI's Process and Industrial Division and would be assigned to that division. He was also told that he would be treated as a "National Sales Executive" for the Invensys account and CDI created organizational charts that listed him as such and that were forwarded to Invensys. (A copy of this chart is attached hereto).

Mr. Barthel was also promised that as National Sales Executive he would have ongoing account responsibility similar to Heather Dunkin, who was a National Sales Executive with respect to the Siemens account. Again Mr. Bickley and Mr. Magliozzi specifically promised Mr. Barthel that he would have ongoing client contact and would be paid an ongoing commission of 2% of direct margin received by the Company for the life of the contract. Mr. Barthel believes that his supervisor, Mr. Bickley, will confirm these discussions and promises regarding commissions.

Based on these assurances Mr. Barthel worked diligently to secure the Invensys contract. This work included having Invensys agree that CDI could bid on the contract in question. Mr. Barthel thereafter was heavily involved in the bid process. After the initial bid process CDI was not selected as the service provider by Invensys. Mr. Barthel, however, was able to obtain additional time for CDI to rework and re-present its bid, which was ultimately accepted by Invensys. Mr. Barthel was the sole initiating cause of the Invensys contract and was instrumental at every stage of the bid and award process. This can be confirmed by Invensys' primary decision maker, Rick O'Dell, who stated, in the presence of both Mr. Bickel and Mr. Magliozzi, that Mr. Barthel had done a masterful job bringing all the parties together at the right time.

Only after the contract was secured was Mr. Barthel informed by CDI that he would not be compensated as previously agreed but instead would be paid only a one-time $15,000 referral bonus. (The above pattern was repeated with respect to a potential CDI contract with EMC, but apparently CDI was unsuccessful in securing the EMC opportunity). The CDI contract is estimated to generate annual gross revenues of $20 million. Using the budgeted direct margin figure of 20%, it will generate direct margin of approximately $4 million per year. If CDI were to pay Mr. Barthel in accordance with the prior agreement, he would receive 2% of direct margin or approximately $80,000 per year. In short, CDI has renounced its obligation to pay commissions that will likely total approximately $240,000 during the life of the contract.

Mr. Barthel has already raised his concerns and objections as to CDI's failure to pay commissions with his supervisor, Mr. Bickley, and with others including Randy

McClain and Richard Giannone. Mr. Giannone conducted a conference call with Mr. Barthel, Mr. Bickley and Mr. Magliozzi but refused to discuss the facts of the situation. He then forwarded Mr. Barthel an e-mail in which he angrily denounced Mr. Barthel's commission claims, but failed to address in any way the commitments that had previously been made to Mr. Barthel. Mr. Barthel is also aware that Mr. Bickley in turn passed Mr. Barthel's concerns and objections on to his superiors, including President Robert Giorgio. Notwithstanding these objections CDI has taken the position that it will not pay Mr. Barthel commissions as previously agreed.

On August 23rd Randy McClain, the Eastern Region Vice President of IT Services, presented Mr. Barthel an award for the Invensys win which he described as one of CDI's largest deals in the last several years. Thereafter Mr. Barthel asked Mr. McClain directly about the P&I division unfairly taking both the Invensys and EMC accounts from him. Mr. McClain replied that he was sorry it happened but that he would have lost his job if he had pursued Mr. Barthel's claims any further. Shortly thereafter CDI terminated Mr. McClain. Mr. Barthel also believes that Mr. Bickley has been criticized for raising Mr. Barthel's concerns with Mr. Bickley's superiors, including President Giorgio.

Again, Mr. Barthel is prepared to proceed with a formal Wage Complaint to the Massachusetts Attorney General's Office as set forth in M.G.L. c. 149 § 150. Thereafter he is prepared to bring suit in his own name, as also provided for in the above statute. Mr. Barthel's preference, however, continues to be a negotiated resolution of his claims that will fairly compensate him pursuant to CDI's prior agreements for the business that he generated for CDI. If CDI is interested in pursuing such a resolution, please contact me by January 5th, 2007.

Very truly yours,

James A. Kobe

Enclosure


CDI Business Solutions
Transition Leadership and Team
Process for Program Roll-out…
VP/General Manager
(Dean Magliozzi)
National Sales Executive
(Jim Barthel)
Transition Project Director
(Mike Heiring)
Project Controls
(Tim Ratner)
Sr. Operations Director
(Mark Perry)
RPM Fulfillment Manager
(Heather Bailey)
SAN Director
(Davida Black )
HR Manager
(Robin Galli)
Technology Director
(Roger Strain)
Business Systems
(Joanie Kostas)

# Exhibit D



# CORRECTIVE ACTION FORM

Employee: Jim Barthel
Division/Company: IT Solution Westborough, MA

Manager: Chuck Bickley
Date of Meeting: January 15, 2007

- ☐ Written Warning
- ☐ Final Warning

**Reason for Discussion:**

Poor sales results for IT Solutions – lack of orders, placements and DM.
Lack of formal agreements with key prospects.

**Prior Warnings or Counseling Sessions** (provide dates and subject matter and attach prior documentation):

Weekly discussions about lack of orders from key new accounts and prospects in addition to not having executed standarc or customized services agreements or planned RFPs.

**Performance Deficiencies**: List specific facts (Use the STAR method to describe the specific issues/problems. S/T=Situation/Task, Action, Results)

No new account penetration in 2006 beyond Invensys and EMC. Daily informal sales meetings to discuss progress by account. Made joint calls on accounts. Results in terms of RFPs, agreements, job orders and placements have been non-existent.

**Objectives:** (What performance objectives are we trying to achieve?)

CDI IT Solutions sales results – qualified job orders, placements and acceptable DM.

**Solutions:** (What suggestions, recommendations or requirements should be set to aid in correction of the problem?)
(A Corrective Action Plan should accompany this Corrective Action Form)

**Managers**: Work with Jim to make sure all available options are being used to close business at the identified IT Solutions prospects. Closed business means executed services agreements, qualified job orders with hiring managers, qualified timely submittals, placements with DM in excess of 20%.

**Employees:** Drive to important results: qualified job orders, placements and $30 of DM > 20%.

**Action Plan:** (List agreed upon objectives/action plan to correct behavior or improve performance, the metrics and dates for follow-up)

| Action | Metric (How you know it is accomplished) | Date |
|---|---|---|
| Close new accounts with services agreements | 2 new account agreements completely executed | Weekly status and update meetings through 2/15/2007 |
| Bring in new highly qualified job orders. | 4 new job orders from new accounts per week<br>4 qualified submittals per week<br>1 placement per week | Weekly meetings through |

| | | |
|---|---|---|
| | Net new DM of $30 for the month | 2/15/2007 |

**Consequences:** (What will happen if improvement does not occur or is not sustained within agreed upon time frame?)

Failing to meet or exceed the above action plan during the next 30 days will result in further action including termination.

*Failure to improve this problem will lead to further action, up to an including termination.*

The above performance/behavior issue has been discussed with me. I understand that either my failure to improve my performance/behavior or the occurrence of additional incidents of unsatisfactory performance/behavior will result in further disciplinary action, up to and including termination. Signing this form does not imply that I agree with the action taken, only that I acknowledge receipt of such notice

Employee Signature    Date

Manager Signature    Date    Witness Signature    Date

# Exhibit E



# CORRECTIVE ACTION FORM

| | | | |
|---|---|---|---|
| Employee. | Jim Barthel | Division/Company: | IT Solutions<br>Westborough, MA |
| Manager: | Chuck Bickley | Date of Meeting: | February 20, 2007 |

XX Written Warning
XX Final Warning

Reason for Discussion:

Jim's performance both before and after the Written warning dated January 15, 2007 was poor. Jim's performance since January 15, 2007 has shown no improvement. Unless Jim meets all of the objectives and obligations contained in this final written warning, he will be terminated.

Continued poor sales results – Jim has not hit any of the objectives outlined and agreed to during the initial discussion regarding this Written warning. He has no formal agreements signed nor close to being signed, he has not brought in any Job Orders and subsequently has not achieved any submittals, hires or DM. Also, his activity towards goals of connected calls (40 per week), meetings (10 per week), new job orders ( per week) and 1 hire at a minimum of $10/hour in $DM – none of these are not being met and you have not met any of these goals for any week in 2007 and beyond.

For all of 2007 through 2/11/07 (7 weeks) and in accordance with the goals mentioned above you are significantly behind in all of these targets:

- Calls – actual is 10 vs. target of 280
- Meetings – actual is 11 vs. target of 70
- Job Orders – actual is 1 vs. target of 28
- Hires – 0 vs. target of 7

To give you an idea of the underperformance in all of these categories, I have provided the average performance for these same 7 weeks for all other Sales Exec's with tenure in this position of at least 6 months:

- Calls – 152 vs. your performance of 10
- Meetings – 40 vs. your performance of 11
- Job Orders – 29 vs. your performance of 1
- Hires – 2.67 vs. your performance of 0

Prior Warnings or Counseling Sessions (provide dates and subject matter and attach prior documentation):

Formal meetings held with Jim to discuss prospects and attainment on Jan 19th, Jan 26th, Feb 2nd, Feb 9th. Informal discussions held on Mondays and Wednesdays to discuss activities (connected calls and meetings) and results (tactics and progress towards goals written and discussed on January 15, 2007). We have also been having these discussions throughout Q4 2006, with no improvement. In addition to the discussions with Chuck Bickley, Bill Lage has sent out notes every month updating all Sales Executives on the results of $DM and activity for the prior month. Bill stresses each month the importance of $DM performance and activity. Jim has not made any improvements since these discussions. Bill also had a call with the team himself on 10/31/06 and again on 12/1/06 – during both of these calls Bill stressed the importance of both activity and $DM performance results. Bill and Jim engaged in specific discussions around this (especially on the 10/31/06 call), at which time Jim committed tha his activity and performance would improve.

Performance Deficiencies: List specific facts (Use the STAR method to describe the specific issues/problems. S/T=Situation/Task, Action, Results)

Performance measurements:

| | | | |
|---|---|---|---|
| Connected calls: | Q32006 | 3 | (average per week 0.23) |
| | Q42006 | 35 | (average per week 2.69) |
| | YTD 2007 | 10 | (average per week 1.43) |
| Meetings: | Q32006 | 0 | |
| | Q42006 | 34 | (average per week 2.6) |
| | YTD 2007 | 11 | (average per week 1.6) |

Job Orders: one
Placements: none
Agreements executed: none
New DM: none

As part of the corrective action plan of January 15th, made joints calls with Jim at Citizen's Bank on Jan 16th, Staples on Jan 24th, MassMutual on Feb 7th, and Gillette on Feb 8th. Also, had updates on Ahold, EMC, State Street Bank – all three projects or RFIs or RPFs slipped. In making these calls with Jim, it feels as though these are viable prospects for CDI IT Staffing, but timing is such that they will not be producing results as quickly as we would like to see. Although Jim seems to have the tools and knowledge to effectively achieve sales activities and results, he does not currently appear to have the passion nor the energy necessary to complete any of the objectives agreed to on January 15, 2007. Again, we have had several conversations for the past 4-5 months with Jim about the need to improve his activities and performance with no significant improvement.

Objectives: (What performance objectives are we trying to achieve?)

The CDI standard sales objectives below are still the results and objectives that need to be achieved. However, Jir does not seem to be focused on driving the right level activity in order to receive the desired results. These are the specific goals that all CDI Sales people are tasked with and measured against:

40 connected calls
10 in-person meetings with 5 being with new people
4 new job orders
1 new hire at $10/hour in $DM+

These goals are not optional and a reasonable effort must be made each week to achieve these objectives and continue employment with CDI.

Solutions: (What suggestions, recommendations or requirements should be set to aid in correction of the problem?)
(A Corrective Action Plan should accompany this Corrective Action Form)

I have worked with Jim both in person and over the phone to strategize and plan to drive for above results. It has become obvious that Jim does not have to passion or enthusiasm for make this plan happen. Jim is not only not performing in his results but also not putting in the necessary effort on his activities. This needs to improve immediately to remain employed with CDI and all goals and objectives must be met.

Action Plan: (List agreed upon objectives/action plan to correct behavior or improve performance, the metrics and dates for follow-up)

| Action | Metric: (How you know it is accomplished) | Date |
|---|---|---|
| Given the lack of results in order for Jim to succeed he needs to focus and commit to driving better and higher volume of activity. In order to get back on track and provide short term reasonable expectations and objectives for you to meet, your weekly objectives while on this plan are being based on "average" Sales performance across the IT Staffing unit vs. the standard stretch Sales objectives. Jim must meet or exceed the weekly goals for connected calls, meetings, job orders and hires at specified DM each week. Provided these objectives are met, it will provide a foundation of continue improvement towards meeting CDI standard Sales Objectives. | ○ 26 connected calls per week.<br>○ 5 in-person meetings per week 5 being with new people.<br>○ 3 new job orders per week.<br>○ .75 new hires per week at $10/hour in $DM+. | Jim must meet the specified minimum weekly goals each week, beginning on Tuesday 2/20/07, these goals are not new to Jim, they have been set based on average CDI Sales Performance, and he has been told by his immediate boss and our Sr. VP of Staffing that these goals are critical to each employee. |

Consequences: (What will happen if improvement does not occur or is not sustained within agreed upon time frame?)

**If Jim does not meet all of these goals each week of this final warning, his employment will be terminated at that point.**

*Failure to improve this problem will lead to further action, up to an including termination.*

The above performance/behavior issue has been discussed with me I understand that either my failure to improve my performance/behavior or the occurrence of additional incidents of unsatisfactory performance/behavior will result in further disciplinary action, up to and including termination. Signing this form does not imply that I agree with the action taken, only that I acknowledge receipt of such notice.

Employee Signature Date

Manager Signature Date Witness Signature Date

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

JAMES BARTHEL,

PLAINTIFF,

v.

CDI CORPORATION, ROGER BALLOU and MARK KERSCHNER,

DEFENDANTS.

CIVIL ACTION NO. 07-00599

**NOTICE OF FILING OF NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§ 1441 and 1446(d), Defendant CDI Corporation hereby gives notice to the Superior Court of Norfolk County, Massachusetts, and the attorney for Plaintiff James Barthel, that, on May 29, 2007, CDI filed a Notice of Removal, thereby removing this Action to the United States District Court for the District of Massachusetts. A certified copy of the Notice of Removal is attached to this Notice.

Respectfully submitted,

CDI CORPORATION

By its attorneys

Suzanne Suppa (BBO #565075)
David M. Jaffe (BBO #641610)
**LITTLER MENDELSON, P.C.**
One International Place, Suite 2700
Boston, MA 02110
Phone 617.378.6000
Fax 617.737.0052

Dated: May 29, 2007

CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2007 a true and correct copy of the **Notice of Filing of Notice of Removal** was served by regular mail upon the following:

James A. Kobe, Esq.
James A. Kobe P.C.
20 William Street, Suite 155
Wellesley Hills, MA 02481

David M. Jaffe

Firmwide:82466537.1 043862.2006

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES BARTHEL,

PLAINTIFF,

v.

CDI CORPORATION, ROGER BALLOU and MARK KERSCHNER,

DEFENDANTS.

CIVIL ACTION NO.

**NOTICE TO ADVERSE PARTY OF FILING OF NOTICE OF REMOVAL**

TO: James A. Kobe, Esq.
James A. Kobe P.C.
20 William Street, Suite 155
Wellesley Hills, MA 02481

PLEASE TAKE NOTICE that CDI Corporation in the above-referenced Action filed a Notice of Removal to the United States District Court for the District of Massachusetts on this 29 day of May, 2007. 28 U.S.C. § 1441. A copy of such notice is attached.

Respectfully submitted,

CDI CORPORATION

By its attorneys

Suzanne Suppa (BBO #565075)
David M. Jaffe (BBO #641610)
**LITTLER MENDELSON, P.C.**
One International Place, Suite 2700
Boston, MA 02110
Phone 617.378.6000
Fax 617.737.0052

Dated: May 29, 2007

CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2007 a true and correct copy of the **Notice to Adverse Party of Filing of Notice of Removal** was served by regular mail upon the following:

James A. Kobe, Esq.
James A. Kobe P.C.
20 William Street, Suite 165
Wellesley Hills, MA 02481

Dated: May 29, 2007

David M. Jaffe

Firmwide:82466374.1 043862.2006