UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JAMES BARTHEL, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 07-cv-11000 (WGY) |
| | ) | |
| | ) | |
| CDI CORPORATION, | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**PLAINTIFF JAMES BARTHEL'S
MOTION TO ALTER OR AMEND THE JUDGMENT**

Plaintiff James Barthel, through counsel, hereby moves, pursuant to Fed. R. Civ. P. 59(e), to alter or amend the judgment issued orally by the Court on December 4, 2008. (A transcript of the Court's Findings and Rulings is attached hereto as Exhibit A).

I. INTRODUCTION

As detailed below, Mr. Barthel respectfully requests that the Court alter or amend its findings, rulings and Judgment with respect to three issues. First, he seeks amended rulings as to CDI's corrective action plans. As to the second plan (which was the ultimate basis for Mr. Barthel's termination), he seeks a ruling that the content and manner in which CDI created the second plan evidences CDI's desire to retaliate against him for his prior complaints. As to both plans, he seeks a ruling that CDI, by evaluating Mr. Barthel as if he had generated no business

in 2006, when it knowingly and in bad faith had previously breached its promise to credit Mr. Barthel for substantial Invensys business, acted out of a retaliatory intent.

Second, Mr. Barthel seeks a related but alternative ruling that Mr. Lage's "mechanistic" approach to evaluating subordinates (including Mr. Barthel), even if applied neutrally by Mr. Lage, was nevertheless "infected" by the desire of other CDI employees' (including Mr. Magliozzi) to retaliate against Mr. Barthel for his prior complaints. Plaintiff relies for this proposition primarily on the case of Cariglia v. Hertz Equipment Rental Corporation, 363 F.3d 77 (1st Cir. 2004), which related to an analogous discrimination case. In Cariglia the First Circuit ruled that corporate liability can attach if neutral decisionmakers, when deciding to terminate an employee, rely on information that is inaccurate, misleading or incomplete because of another employee's discriminatory animus.

The final issue as to which Mr. Barthel seeks amended findings is with respect to his unjust enrichment claim. The Court ruled that CDI acted in bad faith but that the Court could not calculate damages with respect to Plaintiff's claim for breach of the duty of good faith and fair dealing. The Court similarly ruled that it could not calculate damages with respect to plaintiff's claim for unjust enrichment because the Court had ruled that the parties did not enter into an enforceable contract with respect a specific commission amount. Plaintiff submits, however, that the evidence that was admitted regarding past compensation of sales representatives in the P&I Division with both a higher base pay and commissions in the range of 2% of direct margin provide sufficient evidence for a reasonable approximation of the degree that CDI was unjustly enriched.

II. DISCUSSION

    A. The Evidence Demonstrated CDI's Retaliatory Motive In Its Corrective Action Plans For Mr. Barthel

    1. Second Corrective Action Plan Inaccurate And Undoable

The Court made findings as to CDI's first corrective action plan for Mr. Barthel but did not make findings as to CDI's second corrective action plan. (Transcript, Exhibit A, p. 13). However, Mr. Barthel was not fired for his failure to comply with the first plan, but for his failure to comply with the second plan. Mr. Lage specifically testified that as of the date of the second plan he had not decided to fire Mr. Barthel. Thus, the crucial issue for purposes of retaliation analysis is whether retaliation was a "determinative cause" of the second plan. The testimony of Mr. Barthel's supervisor, Charles Bickley (who the Court found to be generally credible), provided significant evidence that retaliation was such a cause. In his testimony Mr. Bickley adopted his prior deposition testimony that the second plan was both inaccurate and undoable. He further testified that he advised both Mr. Lage and Mr. Aloupis that the second plan was inaccurate and undoable and they nevertheless refused to make any changes to the second plan. (Bickley Deposition Transcript Excerpt, (Day II pp. 57-58), is attached hereto as Exhibit B). Mr. Barthel therefore requests a finding that CDI's desire to retaliate against Mr. Barthel for his prior complaints was a determinative factor in its issuance of the second corrective action plan that was the CDI's stated basis for its ultimate termination decision.

    2. First And Second Plan Based On CDI's Breach of Promise Of Credit For Business

As to both plans, Mr. Barthel seeks an amended ruling that retaliation was a determinative cause. The Court noted that Mr. Lage mechanistically analyzed data regarding business generated and number of telephone calls and number of meeting held. The Court also credited Mr. Lage's testimony that he viewed the number of phone calls and meetings as

3

important because they were the building blocks to generating business. Thus the Court implicitly found and plaintiff seeks an express finding that the data that was most important to CDI was the amount of business generated. Mr. Bickley also testified and Mr. Lage confirmed that as to area managers the primary basis for evaluation was revenue and direct margin generated.

The Court noted that "[o]nce having stripped Mr. Barthel of any credit for bringing in the Invensys business,…" Mr. Barthel did not fare well under Mr. Lage's mechanistic analysis. But the Court also expressly found that Mr. Magliozzi and Mr. Bickley made promises to Mr. Barthel and that they "…promised that upon success he could be transferred to the P&I Division, that he would be the national sales representative, <u>he would get credit for bringing in this account</u>, and would manage the account thereafter." (Transcript, Exhibit A, p. 4). (Emphasis added). The Court also found that Mr. Magliozzi had at least apparent authority to give Mr. Barthel "credit for the sale." <u>Id</u>. Mr. Barthel's March 15th, 2006, e-mail to Mr. Bickley expressly confirmed that he would get "quota credit" for the business in addition to incentive compensation. (Trial Exhibit 15, attached hereto as Exhibit C).

The Court expressly found that CDI's breach of its promises to Mr. Barthel was a breach of its duty of good faith and fair dealing as to Mr. Barthel. (Transcript, Exhibit A, pp. 6-7). The Court went so far as to characterize CDI's conduct as "reprehensible." (<u>Id</u>. at p. 6).

CDI's in-house counsel, Gary Goldman, received and responded to Mr. Barthel's December, 2006 demand letter. Mr. Bickley testified that in December he was interviewed by Mr. Goldman and provided relevant documents to him. As to that demand letter the Court stated, "I further infer that higher-ups in the corporation were well aware that Mr. Barthel had filed a demand letter, one which they very well knew was not lacking in merit, whatever Mr.

Magliozzi may have said." (Transcript, Exhibit A, p. 12). On January 11, 2007, in response to Mr. Lage's directive to place Mr. Barthel on a performance improvement plan, Mr. Bickley asked CDI's Human Resources representative, Mike Aloupis, how to express the plan "against the fact that Jim has been responsible for a significant piece of business for CDI in 2006 and 2007." (Trial Exhibit 36, Exhibit D hereto). Mr. Bickley then asked, "can you check with Gary Goldman and make sure we are going down the right path by putting Jim on an improvement plan?" (Id.). As Mr. Barthel received his first plan just four days later the response Mr. Bickley received is clear.

In short, CDI knowingly placed Mr. Barthel on a performance improvement plan in January of 2007, primarily for his failure to generate business, even though CDI knew at the time of the plan that it had in bad faith breached its prior promise to Mr. Barthel of credit for a huge amount of business. The Court's finding that Mr. Lage personally simply applied his methodology to the data he was given (no business generated by Mr. Barthel) does not mean that CDI's motive was not retaliatory and should not insulate CDI from liability when, as the Court has already found, CDI's higher ups knew both that Mr. Barthel was promised credit for business, but was not given such credit, and knew that he was primarily being terminated for failure to generate business.

CDI's knowing breach of its promise to give Mr. Barthel credit for Invensys business and its subsequent termination of him for failure to generate business can also be analyzed simply in terms of a breach of contract. Under that analysis one of the outcomes of CDI's breach of its promise is Mr. Barthel's termination and he should be entitled to recover the damages he suffered as a result of said breach, namely lost wages for one year.

    B. <u>Mr. Lage's Evaluation of Mr. Barthel's Performance Was Infected By The Retaliatory Animus of Other CDI Employees, Including Mr. Magliozzi</u>

The Court ruled, after acknowledging that it was a close question, that CDI's termination of Mr. Barthel was not retaliatory because it resulted from Mr. Lage's mechanistic approach of evaluating data regarding business generated by Mr. Barthel as well as calls made and meetings held. The Court did not analyze, however, the extent to which the process by which Mr. Lage evaluated Mr. Barthel was tainted or infected by the retaliatory motives of other CDI employees, including Mr. Magliozzi. (Mr. Barthel has already discussed above that the process was infected by CDI's knowing failure to honor its promises to credit Mr. Barthel for Invensys business generated under the contract).

As an initial matter, though it is implicit in the Court's reference to Mr. Barthel's "complaints" (Transcript, Exhibit A, p. 10), Plaintiff wishes to clarify that Mr. Barthel's relevant "protected conduct" is not simply his attorney's formal demand letter in December of 2006 but includes all of his complaints about failure to pay commissions dating back to the "Dunkin Donuts meeting" of May 5, 2006 when he first confronted Mr. Magliozzi. The Massachusetts Supreme Judicial Court has made clear, in the case of Smith v. Winter Place, LLC, 447 Mass. 363 (2006), that an employee's internal complaints regarding non-payment of wages trigger the relevant anti-retaliation provisions of the Wage Act.

Mr. Barthel introduced evidence that not only was he the victim of retaliation when he was terminated, but that he also was the victim of ongoing retaliation starting immediately after his initial complaints to Mr. Magliozzi on May 5th. On May 8th Mr. Magliozzi sought to remove Mr. Barthel from RPM work at EMC. (Trial Exhibit 45, attached hereto as Exhibit E). He thereafter took both control and credit from Mr. Barthel and Mr. Bickley of a separate ProProcess opportunity at Invensys. (Trial Exhibit 32, attached hereto as Exhibit F).

6

Most damaging of all to Mr. Barthel, however, was CDI's decision to reverse its initial decision that Mr. Barthel was still free to pursue IT business at Invensys that was outside the scope of the RPM contract. Mr. Bickley estimated this potential "rogue" IT business to be approximately $5 million. Invensys' representative Richard O'Dell testified as to his respect for Mr. Barthel and the quality of his work. CDI's decision to prohibit Mr. Barthel from pursuing additional IT business at Invensys was a high-level decision made by Robert Giorgio as evidenced by the Edward Zetusky e-mail of June 12, 2006, that stated: "…get them to stop talking to this client. Giorgio has spoken and in no one's best interest to keep pushing this." (Zetusky e-mail is part of Trial Exhibit 31, attached hereto as Exhibit G).

Mr. Giorgio, as of June, 2006, was the supervisor of both Mr. Richard Giannone (Dean Magliozzi's immediate supervisor), and of William Lage. Mr. Lage in turn testified that after he assumed responsibility for supervising Mr. Bickley, that Dean Magliozzi requested that Mr. Lage not permit Mr. Barthel and Mr. Bickley to pursue rogue IT spend at Invensys. On October 27, 2006, Mr. Lage harshly ordered them to have no contact at all with Invensys. (Trial Exhibit 34, attached hereto as Exhibit H).

In light of the Court's findings that Mr. Magliozzi breached his promises to Mr. Barthel and that Mr. Barthel's ongoing and vociferous complaints about Mr. Magliozzi had merit, there can be no question that Mr. Magliozzi had tremendous incentive to limit Mr. Barthel's future success and in fact his continued employment at CDI. Plaintiff therefore requests a finding that CDI's prohibition against Mr. Barthel pursuing further IT business at Invensys constitutes retaliatory action against Mr. Barthel by CDI.

Plaintiff also seeks a finding that Mr. Lage's decision to terminate Mr. Barthel (even if the result of his neutral application of his methodology) was in fact tainted and infected by the

retaliatory actions of other CDI employees, including Mr. Magliozzi, which greatly limited Mr. Barthel's opportunities to generate significant business. One of the results of CDI's retaliatory actions against Mr. Barthel was that the primary "data" analyzed by Mr. Lage, namely business generated, was greatly diminished. Thus even if Mr. Lage's analysis was personally neutral, the process that he used and therefore the outcome were tainted and infected with retaliation.

Plaintiff submits that the Court's analysis of Mr. Barthel's termination is analogous to the First Circuit's analysis of plaintiff's termination in the case of Cariglia v. Hertz Equipment Rental Corporation, 363 F.3d 77 (1st Cir. 2004). In Cariglia the First Circuit analyzed whether a decision to terminate plaintiff that was made by "neutral" decisionmakers was nevertheless discriminatory because the process was tainted or infected by the discriminatory animus of others. The First Circuit stated that the "critical issue" in the case was "…whether corporate liability can attach if neutral decisionmakers, when deciding to terminate an employee, rely on information that is inaccurate, misleading, or incomplete because of another employee's discriminatory animus." (Id. at 83). The First Circuit resolved this critical issue in favor of the plaintiff. The Massachusetts Supreme Judicial Court demonstrated, in the case of Smith v. Winter Place LLC, 447 Mass. 363 (2006) at f.n. 4, its willingness to rely upon cases analyzing retaliation and termination issues in the context of discrimination claims, as guidance for the analysis of cases involving alleged retaliation in the context of the Massachusetts Wage Act.

The Cariglia decision is particularly relevant for its determination that the focus of the analysis should not be simply on whether a particular decision maker was infected with animus but also on whether the decision-making process itself was infected. The Cariglia court stated: "This focus on whether Heard's [one not involved in the termination decision] animus infected

people (the decisionmakers) rather than the process (manipulating the information relied upon by the decisionmakers) was erroneous." Id. at 85. The Cariglia court went on to cite to earlier relevant First Circuit decisions as follows:

> Although we have not been presented before with the same fact pattern we face here, we have held that "evidence of corporate state-of-mind or discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or time frame involved in the specific events that generated a claim of discriminatory treatment." Conway v. Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987) (emphasis added). See also Cummings v. Standard Register Co., 265 F.3d 56 (1st. Cir.2001)(same). Similarly, in Freeman v. Package Machinery Co., 865 F.2d 1331, 1342 (1st Cir.1988), we rejected a defense that the decisionmaker personally lacked animus and held that "[t]he inquiry into a corporation's motives need not artificially be limited to the particular officer who carried out the action."

Cariglia at 85.

Mr. Barthel requests a finding that Mr. Lage's termination decision, even if a neutral application of a methodology to data in CDI's record-keeping systems, nevertheless constituted a retaliatory termination in that the data was inaccurate, misleading and/or incomplete because of the retaliatory actions and manipulations of other CDI employees, including but not limited to Mr. Magliozzi.

### C. The Court Can Award Unjust Enrichment Damages Based on Testimony As To Compensation Paid To Other P&I Salespersons

The Court ruled that, as with plaintiff's claim with respect to breach of the duty of good faith, the Court could not calculate damages as to Mr. Barthel's claim of unjust enrichment. The Court stated that because it found that there was no contract to pay Mr. Barthel a particular commission, it had no basis to calculate the degree to which CDI was unjustly enriched by its failure to pay incentive compensation on the Invensys contract.

The Court did find, however, that CDI promised to transfer Mr. Barthel to the P&I Division and that CDI's representatives promised that he would be adequately rewarded and

9

that Mr. Bickley and Mr. Magliozzi understood that for bringing in the Invensys account Mr. Barthel "…in fairness ought to be compensated in a different fashion, over a longer lead time, than this one-time $15,000 bonus payment." (Transcript, Exhibit A, pp. 5-6). Though the Court ruled that the evidence did not establish that CDI entered into a contract to pay a 2% direct margin commission to Mr. Barthel, the Court nevertheless heard significant testimony regarding that figure. Mr. Bickley testified that he discussed with Mr. Magliozzi incentive compensation paid to other P&I salespeople in seeking to establish a commission rate for Mr. Barthel and that he and Mr. Magliozzi discussed the 2% of direct margin figure. (Mr. Bickley also testified that Mr. Magliozzi stated that Mr. Barthel would receive a higher annual base pay as an employee of the P&I Division). Finally, Mr. Bickley stated that he discussed with Mr. McClain the 2% direct margin figure and that Mr. McClain indicated that based on his understanding of P&I's past practices that 2% was the best that Mr. Barthel could do.

In short, there was testimony that the past practice of the P&I Division was not only to pay its sales representatives a higher base than Mr. Barthel was receiving but to also pay them commission that in at least some cases was 2% of direct margin. (It is also relevant that commission rates typically increase with the volume of business generated. For example, Mr. Barthel's CDI IT commission plan (Trial Exhibit 3) provided for 3% commission on direct margin up to $200,000, on up to 14% commission on direct margin in excess of $1 million).

The Court has already found that the CDI contract would not have been obtained by CDI without the efforts of Mr. Barthel. (Transcript, Exhibit A, p. 7). The Court has also found that Mr. Barthel was promised at least ongoing compensation in an amount greater than the $15,000 bonus that he received. It is undisputed that the Invensys contract has generated in

excess of $23 million in revenue to CDI through October 2008 and direct margin (or revenue less direct costs) of more than $2.4 million. (Trial Exhibit 12).

Based on CDI's past practices, it would have paid a successful sales representative who brought in a contract like the Invensys contract both a higher salary than paid to Mr. Barthel and a commission in the range of 2% of direct margin. Both Massachusetts and federal courts have held that damages may be approximated. See Evans v. Yegens Associates, Inc., 556 F. Supp. 1219 (D.Mass. 1983) and the recent Massachusetts Appeals Court case of Renovator's Supply, Inc. v. Sovereign Bank, 72 Mass.App.Ct. 419 (2008). In the Renovators case the Appeals Court stated: "Reasonable approximation is permissible, especially in circumstances of indefiniteness caused by the conduct of the wrongdoer." Id. at 791. The Renovators court went on to state that "Under our cases, an element of uncertainty is permitted in calculating damages and an award of damages can stand on less than substantial evidence. This is particularly the case in business torts, where the critical focus is on the wrongfulness of the defendant's conduct." Id.

Again the Court has already found CDI's conduct to be wrongful and reprehensible. There is a sufficient basis for approximating CDI's unjust enrichment based on the 2% direct margin rate paid by P&I to others in the past. A commission of 2% on Invensys direct margin just through October, 2008 (not even the full length of the contract) would be in excess of $48,000, separate and apart from any additional base salary that a P&I representative would have earned. Under these circumstances and particularly in light of the Court's finding that CDI's conduct in breaching its promises to Mr. Barthel was reprehensible, an award that CDI was unjustly enriched at least in the amount of $48,000 is justified and appropriate.

III. CONCLUSION

Based on the above points and authorities, plaintiff James Barthel respectfully moves that the Court alter and amend its Judgment to grant him Judgment on his claim that CDI's termination of his employment was a retaliatory termination in violation of the Massachusetts Wage Act and that it calculate damages in accordance with the Wage Act for said retaliatory termination as previously requested in Plaintiff's Requests for Findings and Rulings. Plaintiff James Barthel also respectfully requests that with respect to his claim for Unjust Enrichment that the Court grant him damages in the amount of $48,000 pursuant to the above calculation which is also set forth in greater detail in his previously submitted Requests for Findings and Rulings.

Respectfully submitted,
On behalf of James Barthel
By his counsel,

/s/James A. Kobe_____
James A. Kobe (BBO# 548218)
29 Crafts Street, Suite 360
Newton, MA 02458
(781-283-9191)

Dated: December 10, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of December, 2008, the foregoing Plaintiff's Requests For Findings of Fact and Rulings of Law was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

/s/ James A. Kobe
James A. Kobe